### JAY et al. v. IRELAND & MATTHEWS MFG. CO.

(District Court, E. D. Michigan, S. D. March 30, 1922.)

No. 395.

1. **Patents ☞328—1,132,273, claims 9 and 14, for vacuum feed tank for automobiles, held valid and infringed.**

The Jay patent, No. 1,132,273, for vacuum tank for feeding gasoline to the carbureter of an automobile engine, claims 9 and 14, *held* valid and infringed.

2. **Patents ☞240—Improvement of patented device does not avoid infringement.**

Neither the impairment nor improvement of a patented construction, even though the new structure may embody a patentable improvement, will avoid infringement so long as it contains all the elements called for by the patent claims, functioning together in the same manner as in the patented structure.

In Equity. Suit by Webb Jay and the Stewart-Warner Speedometer Corporation against the Ireland & Matthews Manufacturing Company. Decree for complainants.

Edward N. Pagelson, of Detroit, Mich., and Charles S. Burton, of Chicago, Ill., for plaintiffs.

William M. Swan, of Detroit, Mich., for defendant.

TUTTLE, District Judge. The bill in this case charges infringement by the defendant, Ireland & Matthews Manufacturing Company, of United States letters patent, No. 1,132,273, granted to the plaintiff Webb Jay, March 16, 1915; the coplaintiff, Stewart-Warner Speedometer Corporation, being exclusive licensee under said patent. The article of commerce involved, is a vacuum tank used for feeding gasoline to the carbureter of an automobile engine.

This case having come on to be heard upon the plaintiffs' motion for preliminary injunction, and the defendant's motion to dismiss, and the parties having presented their respective affidavits and exhibits, and it appearing that nothing additional by way of evidence would be desired by either party for hearing on the merits, the parties have agreed in open court that the present hearing should be a final hearing on the merits and that decree shall be rendered accordingly.

There have been put before me, in connection with the claims of which infringement is charged, being claims 9 and 14 only of plaintiffs'

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

patent, the opinion rendered by the United States District Court of the Northern District of Ohio in the suit of the same plaintiffs against Sparks-Withington Company (258 Fed. 45), and the opinion of the Circuit Court of Appeals of this Sixth Circuit, confirming the decree of said District Court, reported in 270 Fed. 449, and my attention has been directed to the specific construction involved in that suit and therein held to infringe said claims 9 and 14, which claims were held to be valid.

There has also been put before me the present defendant's structure charged to infringe said claims, and I have witnessed the operation of the plaintiffs' commercial structure, which, as to all that said claims 9 and 14 relate, is substantially the structure of the patent in suit. Defendant contends that there is substantial difference between the structure of the patent in suit and plaintiffs' commercial structure, but with this contention I do not agree. I have also witnessed the operation of the defendant's device charged to infringe said claims.

My attention has further been directed to the decision of the United States District Court for the Northern District of Illinois, affirmed by the Circuit Court of Appeals for the Seventh Circuit, in a suit by the present plaintiffs against Frederick Weinberg, said opinions reported, respectively, in 250 Fed. 469, and 262 Fed. 973. I have also examined the construction and witnessed the operation of the device of the defendant in that suit, referred to as the "Weinberg tank," and found in the decree therein rendered and affirmed by the Circuit Court of Appeals of the Seventh Circuit, to be not an infringement of said claims 9 and 14, although both of said claims were held to be valid. All of the operated devices were the commercial structures with glass bodies substituted for the metal, so that the interior operation could be clearly observed.

I have also considered certain parts of the record in said suit in the Seventh Circuit, which have been brought to my attention at the present hearing by Weinberg personally, who, upon his statement in open court that he is under contract with the defendant, Ireland & Matthews Company, to defend this suit, has been allowed without objection by the plaintiffs to appear at this hearing substantially as a witness as to certain demonstrations stated by him to have been made in said Seventh Circuit suit, and as to the operation, on an automobile in service, of the said Weinberg device involved in said Seventh Circuit suit, and of the defendant's device involved in the instant suit. My present conclusions are derived from consideration of all the devices, demonstrations, records, and decisions brought to my attention in conjunction with the claims sued on.

[1] According to the interpretation which the Circuit Court of Appeals of this Sixth Circuit has put upon claims 9 and 14 of the plaintiffs' patent, as I understand the opinion rendered in the suit of Jay et al. v. Sparks-Withington Co., supra, and in view of the structure therein held to infringe said claims, they cover broadly a vacuum feed device characterized, as to the vacuum chamber and appurtenances, by three features defined by certain relations, viz.: (1) A suction-controlling valve; and (2) an atmosphere inlet-controlling valve, which valves are

alternately opened; and (3) a liquid outlet valve which is opened by gravity flow of the liquid. To these elements there is added in claim 14, differentiating it from claim 9, the element of an atmosphere vent or inlet to the second or auxiliary chamber, into which the liquid is delivered by gravity flow from the vacuum chamber.

This understanding of the scope given to these claims by the Circuit Court of Appeals of this Sixth Circuit I derive from the following language of the opinion of that court, designed to point out, as I understand, what that court found to be the differentiation of these claims from the prior art:

"With respect to claims 9 and 14: * * * Claim 9 contains the elements of 'means for alternately connecting said supply receptacle (the vacuum chamber) with the exhaust means and with the atmosphere, and means controlling communication between said (vacuum chamber) and said (lower tank), adapted to be opened by gravity flow from said supply to said auxiliary receptacle (lower tank).' Claim 14 also contains the substance of this last element."

The addition of the vent pipe in claim 14 is recognized as distinguishing between the two claims in the concluding sentence of the opinion:

"It does not seem denied that defendant employs the atmospheric pipe called for by the fourteenth claim."

I am bound by the opinion thus indicated by the Circuit Court of Appeals of this Circuit, correctly interpreted, and, furthermore, I find the same in accordance with my own independent judgment from the material evidence before me in this case.

Upon examining and witnessing the operation of the defendant's device, I am convinced that it contains all the elements of these two claims 9 and 14, constructed and co-operating for the same functions and to the same results as in the structure in the patent in suit. It has the vacuum chamber and the auxiliary chamber into which the vacuum chamber discharges by gravity flow. It has a suction communication and atmosphere communication in the vacuum chamber, and valves controlling these two communications, which valves are opened alternately, and this opening is effected by the identical means and in the identical way as in the patent structure, viz. by a float operated by change of liquid level in the vacuum chamber. It has also the outlet or delivery from the vacuum chamber to the auxiliary chamber, controlled by a valve which is opened by the gravity flow or pressure of the liquid in the vacuum chamber.

It is contended on behalf of the defendant that, by reason of the fact that in the defendant's device the seat of the vacuum chamber outlet valve is three degrees out of perpendicular, being undercut to that extent, and that the valve suspended in front of this slightly inclined seat when hanging in vertical position, as it tends to hang by gravity, is separated from the seat by this three degree angle, said valve is opened by gravity, or, as it is otherwise expressed, is "normally open," and cannot be truly said to be opened by gravity flow or pressure of the liquid.

I have carefully watched the operation of the defendant's device in this respect, and it is to be noted, first, that the opening of this valve due to gravity, or to the "hang" of the valve, as distinguished from and

apart from the opening caused by flow of the liquid, is almost negligible in amount, and wholly inadequate for any practical operation of the device as a whole for its purpose of furnishing fuel to the carbureter, and that in fact, in actual practical operation of the device, the valve is always opened by gravity flow or pressure of the liquid, its total opening for the slowest discharge or delivery of the liquid which occurs in the ordinary normal operation of the device, being several times the maximum opening which can be caused by gravity or "hang" of the valve without flow. It is clear to me, therefore, that, even if there is at any time some opening by gravity alone, there is at all times in operation also opening as called for by the claim, caused solely by gravity flow, and this latter opening is the effectual opening for the purpose of the functioning of the device, while the gravity opening is ineffectual for such functioning.

It was also clearly demonstrated by the operation of the defendant's device that while the parts—the valve and its seat—are wet with gasoline, as they must be in actual operation, if at any time there is no liquid in the vacuum chamber, and consequently no flow of liquid therefrom, the outlet valve does not leave its seat when the suction is relieved and the atmosphere admitted to the vacuum chamber, unless the lower chamber is so nearly full of gasoline that the valve and its seat are immersed, but, on the contrary, that valve remains fully seated, being evidently held by capillary attraction, due to the film of moisture between the valve and its seat, and under these circumstances I have observed that, if the valve is jarred or blown open, it returns to its seat, from which I conclude that the three degree divergence between the valve seat and the normal gravity-caused position of the valve yields a crevice so small that very slight moisture on the surface—the imperceptible amount which remains after blowing the valve open—spans the gap between the valve and its seat at the nearest point, and over a sufficient area to produce the capillary action which fully seats the valve. In fact, the only times in which the valve normally hung free and was open for this small space of three degrees was when the valve and its seat were both entirely dry, or when the lower chamber was so full of gasoline that the valve and its seat were immersed in the fluid. During such periods that it was open the three degrees this valve was not performing either the function of stopping the upward flow of air or permitting the downward flow of liquid. Whenever the liquid was flowing from the upper chamber to the lower chamber, the valve was held open by the flow of the liquid.

Regardless of this capillary seating, it is certain that the effectual opening at all times is caused solely by the gravity flow or pressure of the liquid, and that any otherwise caused opening is an ineffectual opening of the valve. It appears that the same contention as made by the present defendant with respect to the so-called normally open valve between the two chambers as constituting an avoidance of the claims in suit was made with respect to the Weinberg tank, involved in the Seventh Circuit suit. Apparently this feature was not mainly relied upon by the District Court in the Seventh Circuit for supporting the finding of noninfringement. But the difference between the valve involved in

that suit and in the instant suit is so marked, as I have learned from examining and witnessing the operation of the two devices, that consideration of the opinions by the District Court and the Circuit Court of Appeals of the Seventh Circuit in respect to the device there involved affords no assistance for my conclusion in the instant suit as to whether claims in suit are avoided by the character of the valve involved in this suit. My conclusion is that, whether or not the valve construction of the Weinberg tank in the Seventh Circuit case avoids the claims, the valve construction of the present defendant's device does not avoid these claims.

The defendant directs attention to a feature of construction of the defendant's device which is not found in the patent in suit, consisting in connecting the air inlet passages of the two chambers, so that they both derive air from outside through one and the same ultimate opening and passage, which passage is branched; one branch connecting with the immediate air inlet of the vacuum chamber at a point above the float-controlled air inlet valve, and the other branch leading to the lower chamber, a small check valve, which opens for inlet of air and seats against air outflow, being interposed between said ultimate opening to the atmosphere and the point at which the passage is branched as stated, so that said valve operates identically as to the air inflow and outflow of both chambers. It is urged that this construction causes the vacuum chamber to derive the air for relieving the vacuum, not from the atmosphere, but from the other chamber, to the extent at least of equalizing the pressure in the two chambers, and that this differentiates the defendant's device from the patent in suit and avoids claims 9 and 14, which call for alternate connection of the vacuum chamber with the suction and with the atmosphere, whereas (it is urged) that by reason of the check valve mentioned in the defendant's device the alternation caused by the shifting of the float-operated valves is an alternation between communication with the suction and communication with the lower chamber, and not an alternation between communication with the suction and communication with the atmosphere.

I am not impressed with this contention. It seems certain that upon reduction of pressure (or production of vacuum) in the upper chamber to 10 pounds (a vacuum of 5 pounds), which I understand is the ordinary or average condition of the device in service on a car, the pressure in the lower chamber being substantially atmospheric, 15 pounds, when the atmosphere valve of the upper chamber is opened by the float, the outer atmospheric pressure will at once force past the slight weight of the little check valve and relieve the vacuum in the upper chamber, and if at the same time the atmospheric pressure, or approximately atmospheric pressure, in the lower chamber reacts to assist in this relief, it will be only to a very slight extent, because, to the extent that the air might pass out of the lower chamber into the upper chamber, the pressure in the lower chamber would be reduced, and, upon the slightest reduction of that pressure, the unreduced outer atmospheric pressure would become the greater, and the air from outside would take precedence of the air from the lower chamber in relieving the vacuum in the upper chamber. But, in any event, the air, if any, which might

pass from the lower chamber to the upper chamber under those conditions would be instantly replaced from the atmosphere; so that in the last analysis the upper chamber is in communication with the atmosphere as to the entire air supply that reaches it; only, so much of that supply as comes through the upper chamber follows a longer path from the atmosphere to the vacuum chamber than the remainder which comes in directly.

Weinberg's contention that the access of the outer air is generally prevented by development of gas from the heating of the fuel in the lower chamber does not impress me. The connection for access of outer air is necessary, and it is here available for use, whether operating at all times or only sometimes. It was insisted by Weinberg that the expedient of connecting the air inlet passages for the two chambers, and interposing the check valve between their junction and the ultimate air inlet, results in an equalization of the pressure in the two chambers, as the first effect of closing the suction valve and opening the atmosphere valve in the vacuum chamber, and that, after this equalization has occurred, both chambers derive their additional air supply from outside through the air opening common to them both. He undertook to demonstrate this by closing this ultimate air inlet.

It is obvious, of course, that without any access of exterior air, and with communication open between the two chambers, the pressure in the two would be equalized by the transference of air from the chamber under the higher pressure to the chamber under the lower pressure, and that the liquid in the upper chamber would descend into the lower chamber until the liquid level in the two chambers, as well as the pressure in the two chambers, became equalized, or until the liquid was all drained out of the upper chamber or the suction valve reversed by the float. This is, of course, what followed upon the operation of the device with the air inlet plugged tight. But under these conditions, clearly, eventually there would be a maximum degree of vacuum in the upper chamber—that is, the highest vacuum which could be produced by the suction producing means—and because of equalization of suction between the two chambers this vacuum would extend to the lower chamber in so far as the same was not filled with the liquid. Thus all the liquid in the device would be under condition of partial vacuum, which would tend to prevent its delivery by gravity to the carbureter.

It is clear to me, therefore, that the conditions under which the equalization of pressure between the two chambers, which constitutes the characteristic mode of functioning of the so-called "closed system" occurs, are conditions of inoperativeness of the device when considered as a whole for its entire purpose. This demonstration made in my presence has completely confirmed the conclusion which I was previously inclined to reach, as above expressed, to the effect that in actual operation of the defendant's device, with the connected air passages and the little check valve, the upper chamber derives its air supply for relieving the vacuum, not to any material extent from the lower chamber, but directly from the atmosphere, and not even indirectly through the lower chamber.

This feature of the defendant's device, I understand, is what is referred to in the opinion of the District Court in the Seventh Circuit as the "Weinberg closed system." Whatever merit this closed system, or the features which constitute it, may have, as to which, for the purposes of this case, I have no occasion to form an opinion, it is clearly a feature added to, and not a subtraction from, the invention called for and covered by claims 9 and 14. The feature of alternate communication of the vacuum chamber with the suction and with the atmosphere is present not the less because (or if) part of the atmospheric communication is obtained through the lower chamber. I have carefully considered the portion of the opinion of the Seventh Circuit District Court which refers to this "closed system" feature; but I find my opinion, as above expressed, unchanged upon such consideration.

[2] The two features above considered, namely, the supposedly normal open outlet valve from the vacuum chamber to the auxiliary chamber, and the air communications constituting the so-called "closed system," are relied upon by the defendant for differentiating its structure from the patent structure in respect to the claims sued on. In my opinion, neither of these features of claimed differentiation involves any omission of the elements of these claims, or any alteration of the functions of the elements or their combination. At most, they may be regarded as additions, and perhaps improvements. But it is well settled that neither an impairment nor an improvement of a patented construction is necessarily an avoidance of the patent, and even if these expedients which characterize the defendant's structure impair or improve the operation, so long as the structure contains all the elements called for by the claims, functioning together in the same manner as in the patented structure, the claims are infringed. This principle has been authoritatively stated as follows:

"The fact, if it be a fact, that the infringing machine is superior, more useful, and more acceptable to the public than that of the appellant, does not avoid infringement, so long as the essential features of the appellant's patented machine are used, unless its superiority is due to a difference in function or mode of operation or some essential change in character." Smith Cannery Machines Co. v. Seattle-Astoria Iron Works (C. C. A. 9) 261 Fed. 85, citing Morley Machine Co. v. Lancaster, 129 U. S. 263, 9 Sup. Ct. 299, 32 L. Ed. 715; Hoyt v. Horne, 145 U. S. 302, 12 Sup. Ct. 922, 36 L. Ed. 713; Lourie Implement Co. v. Lenhart, 130 Fed. 122, 64 C. C. A. 456; Diamond Match Co. v. Ruby Match Co. (C. C.) 127 Fed. 341; Whitely v. Fadner (C. C.) 73 Fed. 486.

Beside the difference in the outlet valve between the two chambers, and the difference in the air inlet passages involved in arranging for the little check valve referred to, there are noticeable detail differences in the valve operating connections in the vacuum chamber. But these detail differences do not change the mode or principle of operation, nor the result in operation, and, as said in Hobbs v. Beach, 180 U. S. 383, 401, 21 Sup. Ct. 409, 416 (45 L. Ed. 586):

"As the two machines are alike in their functions, combination, and elements, it is unnecessary to go further and inquire whether they are alike or unlike in their details."

I have also in mind that the defendant manufactures the infringing device under patents granted as for improvements, consisting in the

features upon which the defendant here relies for distinguishing the defendant's structure from the claims in suit. But it is well settled that the mere fact that a patent embodies a patentable improvement upon the device of a prior patent has no tendency to negative infringement of such prior patent by the structure of the later patent. Munising Paper Co. v. American Sulphite Pulp Co. (C. C. A. 6) 228 Fed. 700, 143 C. C. A. 222; Murray v. Detroit Wire Spring Co. (C. C. A. 6) 206 Fed. 465, 124 C. C. A. 371. In International Time R. Co. v. Bundy R. Co., 159 Fed. 464, 86 C. C. A. 494, the Circuit Court of Appeals of the Second Circuit said, to the same intent:

"All these modifications and additions may be improvements, meritorious enough to secure a patent for them, but they will not negative infringement if a defendant uses the broad invention which a prior patentee has described and covered by his claims"—citing Electric Smelting Co. v. Pittsburgh Reduction Co., 125 Fed. 933, 60 C. C. A. 636.

In Cannery Machines Co. v. Seattle-Astoria Iron Works, above cited, it was held, upon the authority of Imhaeuser v. Buerk, 101 U. S. 647, 25 L. Ed. 945, that:

"Where a combination patent marks a distinct advance in the art to which it relates, as does the appellant's invention here, the term 'mechanical equivalent' should have a reasonably broad and generous interpretation."

This principle may properly be invoked is this case, in view of the finding by the Circuit Court of Appeals of this Circuit in Jay et al. v. Sparks-Withington Co., supra, in the following language:

"Jay's double tank system was an entire novelty to the automobile manufacturing world, commercially speaking. Nothing substantially resembling it had ever been offered to that market. * * * The Jay tank met with very great, and we may reasonably say extraordinary, trade acceptance and success."

In so far as the departures of the defendant's device from the patent in suit can be considered otherwise than as additions, which do not defeat or change the functions of the original combinations, they may be regarded as "mechanical equivalents" for corresponding features of the patented structure, and as fairly within the range of equivalents to which the patentee is entitled in accordance with the principle above stated, and the finding of the Circuit Court of Appeals in Jay et al. v. Sparks-Withington Co., supra.

Decree may be drawn, finding claims 9 and 14 valid and infringed, and granting injunction and reference to master for accounting.